METROPOLITAN LEASING, INC., & another[1] vs. PACIFIC
EMPLOYERS INSURANCE COMPANY & others.[2]

No. 92-P-1819.

Suffolk. November 10, 1993. - May 23, 1994.

Present: BROWN, FINE, & GREENBERG, JJ.

*Insurance*, Insolvency of insurer, Liability insurance, Coverage, Construc-
tion of policy. *Contract*, Insurance.

In the circumstances of a declaratory action brought by an insured to es-
tablish the liability of a third-level excess liability insurer upon the in-
solvency of the second-level excess liability insurer, no language in the
third-level policy created any ambiguity such that the policy could rea-
sonably be construed to provide for excess coverage in amounts differ-
ent from those specifically stated on the schedule [539-541]; nor was
there any language that provided for "drop down" of the coverage in
any circumstances [541] or that could be construed reasonably to pro-
vide for such drop down of coverage [542].
Under the express terms of a second-level excess insurance policy, the pol-
icy of a primary-level excess insurer was no longer "applicable" when
the primary-level excess insurer became insolvent and it could provide
no basis for the higher level policy to "follow form" or "drop down" to
provide coverage. [543]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 5, 1990.

The case was heard by *Patti B. Saris*, J., on motions for
summary judgment.

*David D. Dowd* for Pacific Employers Insurance Company.
*Steven L. Hoffman* for John W. MacNeill & another.
*Ronald E. Harding* for the plaintiffs.

GREENBERG, J. In an insurance market where the most fre-
quent categories of conflict involve coverage questions, the
absence in a policy of a provision addressing what happens

[1]Casey & Hayes, Inc.
[2]John W. MacNeill and Annis L. MacNeill.

when an underlying insurer becomes insolvent is curious, especially since this very issue has required considerable appellate attention lately. See *Northmeadow Tennis Club, Inc.* v. *Northeastern Fire Ins. Co. of Pa.*, 26 Mass. App. Ct. 329, 331 & n.2 (1988), and cases cited. See also *Gulezian* v. *Lincoln Ins. Co.*, 399 Mass. 606, 612 (1987). The void can likely be blamed on the boiler plate parlance contained in most insurance contracts, which fails to address the question whether "excess" insurance "drops down" to the next lowest level of liability when underlying insurers become insolvent.

On December 19, 1985, John W. MacNeill was felled by a hydraulic liftgate attached to the rear of a truck he was planning to drive. As a result, MacNeill became paraplegic and brought a tort action in the Superior Court in 1987. His wife, Annis MacNeill, joined in the action with a loss of consortium claim. The truck was owned by Metropolitan Leasing, Inc. (Metropolitan), and leased to Casey and Hayes, Inc. (Casey), both named as defendants in the action.

At the time of the accident Metropolitan and Casey were insured under three general liability policies: first, a primary policy issued by Liberty Mutual (Liberty) with limits of $1,000,000; second, an umbrella or excess policy issued by Integrity Insurance Company (Integrity) with coverage between $1,000,000 and $11,000,000; and third, an excess insurance policy issued by Pacific Employers Insurance Company (Pacific) for the layer of liability between $11,000,000 and $21,000,000. While the underlying case against Metropolitan and Casey was pending, the second-level excess insurer, Integrity, became insolvent, opening the question whether Pacific's third-level excess coverage "drops down," i.e., provides coverage for Metropolitan and Casey in the event the base policy of $1,000,000 becomes inadequate to cover their potential exposure.

Metropolitan and Casey brought a declaratory judgment action (G. L. c. 231A) to establish the liability of the third-level carrier, Pacific. Cross motions for summary judgment were filed in October 1991. After a hearing, in January 1992, a Superior Court judge determined that language in

Pacific's policy created an ambiguity along the lines of the policy analyzed in *Northmeadow*, 26 Mass. App. Ct. at 332-333. On that construction of the language, she concluded coverage "dropped down" and that Pacific was required to indemnify Metropolitan and Casey for any judgment against them in favor of the MacNeills.

However, the last judicial words on the subject had not been written. Shortly after the judge's decision in the instant case, the Supreme Judicial Court, in *Vickodil* v. *Lexington Ins. Co.*, 412 Mass. 132 (1992), held that similar policy language could not "reasonably be construed to provide coverage in excess of 'collectible' insurance" and that where the excess insurer's obligation was clearly limited by other provisions in the policy to that effect, the policy did not "drop down." *Id.* at 135-136. After further briefing and argument in light of *Vickodil*, the judge denied Pacific's motion for reconsideration. A final and separate judgment entered pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), and Pacific appeals.

The ambiguity, as perceived by the judge, is described in her memorandum:

"The first document which must be examined is Pacific's Certificate of Excess Insurance ('the Certificate'), which does not expressly address the consequences of the insolvency of the primary insurer. Item 5 of the certificate identifies Integrity as the primary carrier which is providing $10,000,000 (umbrella liability) in primary insurance. Item 6 describes excess insurance as $10,000,000. The certificate contains the following relevant provisions:

'B. NOW, this certificate is to indemnify the Insured in accordance with the applicable insuring agreements, exclusions and conditions of the primary insurance for excess loss as specified in Item 6 (Description of Excess Insurance) of the declarations.

.  .  .  .

'F. This certificate may be cancelled by the Insured by surrender thereof to [Pacific] or any of its authorized agents, or by mailing to [Pacific] written notice stating when thereafter such cancellation shall be effective, *it being agreed, however, that in the event of cancellation or termination of the primary insurance, this certificate, to the extent of such cancellation or termination, shall cease to apply at the same time without notice to the Insured*' (emphasis added).

"Paragraph F is the only portion of the Certificate to address the obligation of the excess insurer to the extent of the absence of the primary insurance. It provides that the excess insurance shall 'cease to apply' in the event of cancellation or termination 'to the extent of such cancellation or termination.' Although the certificate does not define these terms, the usual and ordinary meaning of the terms cancellation and termination does not encompass absence of insurance coverage due to insolvency. . . ."

We learn from the *Vickodil* case that a mere failure of the excess policy to deal with the consequences of insolvency does not, by itself, create ambiguity. *Vickodil, supra* at 135. Rather, the specific language of the policy provisions bearing on the subject should determine whether ambiguity exists. See *Massachusetts Insurers Insolvency Fund* v. *Continental Cas. Co.*, 399 Mass. 598, 600 (1987); *Pinheiro* v. *Medical Malpractice Joint Underwriting Assoc. of Mass.*, 406 Mass. 288, 294 (1989).

1. *Paragraph F of the Pacific policy.* Paragraph F of Pacific's "Certificate of Excess Insurance" is the only section of the Pacific policy which speaks to the obligation of the excess insurer in the absence of the second-level carrier. Metropolitan and Casey compare the Paragraph F language to the language of the excess insurance policies quoted in *Massachusetts Insurers Insolvency Fund* v. *Continental Cas. Co.*, 399 Mass. at 599-600 & n.3, and *Gulezian* v. *Lincoln Ins. Co.*, 399 Mass. at 608-610 & n.2, both cases in which the court

found the policy language created ambiguity as to what would happen if the underlying insurer became insolvent.[3]

We conclude that the policies in those cases contain language unlike the policy at issue in this case. In *Massachusetts Insurers Insolvency Fund* v. *Continental Cas. Co.*, 399 Mass. at 599-600, the policy language, quoted in the margin, specifically contemplated that coverage would "drop down" under specified circumstances. A plain reading of that policy's provisions indicates that the amount in excess of which the policy would provide coverage (the excess coverage lower limit) would change based upon the amount of available underlying insurance. By contrast, the Pacific certificate contemplated that its coverage would "cease to apply" to the "extent of . . . cancellation or termination" of the underlying insurance. Nowhere does Paragraph F, or any other pro-

---

[3]The Continental policy construed in *Massachusetts Insurers Insolvency Fund* v. *Continental Cas. Co..* 399 Mass. at 599-600 & n.3, provided that it "will indemnify the insured for loss in excess of the total applicable limits of liability of underlying insurance stated in the schedule," and that, "[w]ith respect to [excess liability indemnity], if the applicable limit of liability of the underlying insurance is less than as stated in the schedule of underlying insurance because the aggregate limit of liability of the underlying insurance has been *reduced* this policy becomes excess of such reduced limit of liability."

In relevant part, the Lincoln policy in *Gulezian* v. *Lincoln Ins. Co.*, 399 Mass. at 608-610 & n.2, provided that "[t]he Company shall be liable only for Ultimate Net Loss resulting from any one occurrence in excess of either (a) the total of the applicable limits of liability of the Underlying Insurance as stated in the Schedule of Underlying Insurance and applicable limits of any other Underlying Insurance collectible by the Insured, less the amount, if any, by which any aggregate limit of such insurance has been reduced by payment of loss during the period of this Policy, hereinafter called the Underlying Limit, or (b) if the insurance afforded by such Underlying Insurance is inapplicable to the occurrence, the amount stated in the Declarations as the Retained Limit, whichever is greater. The limits of liability of any Underlying Insurance Policy shall be deemed applicable irrespective of any defense which the underlying insurer may assert because of the insured's failure to comply with any condition of the Policy subsequent to an occurrence." Also, the policy provided that "[t]he insurance afforded by this Policy shall be excess insurance over any other valid and *collectible* insurance available to the Insured *whether or not described in the Schedule of Underlying Insurance*" (emphasis in original). *Id.* at 611.

vision in the Pacific certificate, contemplate a change in the excess coverage lower limit.

In the *Lincoln* policy, quoted in the margin, postoccurrence events affected the policy's excess coverage lower limit. *Gulezian* v. *Lincoln Ins.*, 399 Mass. at 611. The policy specifically tied the excess coverage lower limit to the amount of underlying insurance "valid and collectible . . . whether or not described in the Schedule of Underlying Insurance." By comparison, the Pacific certificate stated very specifically that coverage was in excess of the underlying insurance on the schedule, and listed no postoccurrence events or conditions of the underlying insurance's validity or collectibility to which the amount of its excess coverage lower limit was tied.

Taken out of context, the insureds' reading of these two cases is plausible. When, however, the policy provisions are compared, we think that Pacific's policy certificate cannot reasonably be construed to provide for excess coverage in amounts different from those specifically stated on the schedules. See *Vickodil* v. *Lexington Ins. Co.*, 412 Mass. at 135-136.

Furthermore, the Pacific policy contained no "drop down" provision, in contrast to the *Continental* and *Lincoln* policies which had ambiguous "drop down" provisions. This distinction is fatal to the insureds' argument. Although the meaning of the clause: "to the extent of such termination or cancellation," is unclear, the subsequent modifying phrase, "shall cease to apply," contemplates a *loss* of excess coverage upon certain conditions subsequent, not an extension of excess coverage into the realm of the scheduled underlying insurers.[4] The language may be imprecise but it is clear that the coverage does not "drop down," nor is it otherwise affected by a second-level insurer's insolvency.

---

[4] This clause is more like a "following form" clause than a "drop down" clause. It anticipates the underlying insurers terminating or cancelling all coverage, or just some type or aspect of coverage. The Pacific contract would follow that form, and cancel or terminate "to the [same] extent" as the underlying insurers. See n.6 *infra*.

2. *Excess insurance description.* In *Vickodil* v. *Lexington Ins. Co.,* 412 Mass. at 135, the court determined that the policy language could not "reasonably be construed to provide coverage in excess of 'collectible' insurance," and that Lexington's commitment was clearly defined that it would "pay excess of the commitments made by applicable underlying insurers." The language in the Pacific certificate is not distinguishable in any important respect from the Lexington policy construed in *Vickodil.*[5] The Superior Court judge found it significant that language in the Lexington policy agreeing to indemnify against loss "which is in excess of the total limit(s) of all underlying insurance" was absent from the Pacific certificate. We, however, find this statement from the Lexington policy analogous to the Pacific language indemnifying against "excess loss as specified in Item 6 (Description of Excess of Insurance)."

The Vickodils, who sought excess coverage under the Lexington policy, argued unsuccessfully that the ambiguity was created by the descriptive words attached to the word "excess" ("of the total limits of all Underlying Insurance"). They contended that this phrase meant that if the underlying insurance dropped to zero, the excess insurance would cover the entire loss. The court rejected this interpretation. *Id.* at 135.

By comparison, because there is no clause in the Pacific certificate modifying the words "excess loss," that language alone cannot avail the insureds. The unadorned words "excess loss," cannot be construed to mean that the coverage will drop down.

---

[5]The policy in *Vickodil* v. *Lexington Ins. Co.,* 412 Mass. at 134-135, provided, in relevant part: "The Lexington Insurance Company . . . hereby agrees to indemnify the insured . . . against loss which is excess of the total limit(s) of all Underlying Insurance specified in Section II (b) of the Declarations subject to the limit of liability stated in Section 1 (c) of the Declarations. . . . Liability of the Company under this policy shall not attach unless and until the Insured or the Insured's Underlying Insurance has paid or has been held liable to pay the total applicable underlying limits."

3. *Following form language.* We mention briefly one other argument made by Metropolitan and Casey. They contend that because the Pacific policy "follows form"[6] to Integrity's second-level excess policy, and that because, the Integrity policy is ambiguous and would, therefore, drop down in the event of insolvency of the primary insurer, the Pacific policy should also drop down into the place of the Integrity policy.

Pacific, on the other hand, contends that the "following form" language means only that the policy covers the same risks as the underlying insurer, and has nothing to do with the excess policy's lower limits or the events which trigger its applicability.

We need only look to the "following form" provision of the Pacific certificate to determine the effect that language may have on Pacific's liability. Paragraph B of the Pacific certificate, the "following form" clause, provides, "NOW, this certificate is to indemnify the Insured in accordance with the *applicable* insuring agreements, exclusions and conditions of the primary insurance for excess loss as specified in Item 6 . . . of the declarations" (emphasis added). Because of the insolvency, the Integrity policy no longer has any effect and cannot be invoked to provide coverage. We do not think this translates into an *applicable* insuring agreement. The potential ambiguity of the Integrity policy notwithstanding, its form is not followed with regard to the "drop down" provision under the express terms of the Pacific policy.[7]

---

[6] A policy which "follows form" "provide[s] coverage in accordance with the terms and provisions of the . . . primary [or underlying] policy." *Industrial Risk Insurers* v. *New Orleans Pub. Serv., Inc.,* 666 F. Supp. 874, 876 (E.D. La. 1987).

[7] At best, if the Pacific "following form" clause did incorporate the "drop down" ambiguity of the Integrity policy, the Pacific coverage would drop down to the first level, not the second level. Cf. *Armstrong World Indus., Inc.* v. *Aetna Cas. & Sur. Co.,* 20 Cal. App. 4th 296, 422-423 (1993). Moreover, the drop down would only be triggered under the conditions that the Integrity policy "drop down" provisions would be triggered. *Ibid.* Specifically, the Integrity policy would "drop down" only if the primary insurer (Liberty) was insolvent.

Accordingly, the judgment is reversed. A new judgment is to enter declaring that Pacific's coverage does not drop down to fill the void created by Integrity's insolvency.

*So ordered.*