# United States Court of Appeals

## For the First Circuit

No. 04-1709

COMMERCIAL UNION INSURANCE COMPANY and
AMERICAN EMPLOYERS' INSURANCE COMPANY,

Plaintiffs, Appellants,

v.

SWISS REINSURANCE AMERICA CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and DiClerico,* District Judge.

Carter G. Phillips with whom William M. Sneed, Stephen C.
Carlson, Sidley Austin Brown & Wood L.L.P., Richard A. Johnston and
Wilmer Cutler Pickering Hale and Dorr LLP were on brief for
appellants.
Edward P. Krugman, Cahill Gordon & Reindel LLP, Eric S.
Kobrick, Associate General Counsel, American International Group,
Inc., on brief for The Member and Affiliated Companies of American
International Group, Inc., Amici Curiae.
David A. Attisani with whom John A. Nadas, Robert A. Kole and
Choate, Hall & Stewart were on brief for appellee.

June 27, 2005

---

*Of the District of New Hampshire, sitting by designation.

**BOUDIN**, **Chief Judge**.    This is a dispute between an insurance company--Commercial Union Insurance Company ("Commercial Union")--and one of its reinsurers, Swiss Reinsurance America Corporation ("Swiss Re").  The principal issue is whether, under several three-year reinsurance policies, Swiss Re was protected by a single per-occurrence limit on its liability for the three-year policy period or whether the limit applies separately for each policy year, thereby enlarging Swiss Re's total exposure.

The background events involve three different tiers of insurance, coverage periods that do not precisely overlap between tiers, and pertinent clauses that are not even identical from one policy to its successor.  Accordingly, in setting the stage, some oversimplification as to the policies and some postponement of detail are both necessary.  We begin at the ground floor with the insured, W.R. Grace & Co. ("Grace"), a well-known company with many different facilities at different locations, and then work up through the tiers.

As to the sites at issue in this case, Grace's primary insurer during the period in question (roughly 1962 to 1974) was Maryland Casualty Co. ("Maryland").  With a one-year exception that is not important to our case, that company provided coverage to Grace under five successive one-year policies between June 30, 1962, and June 30, 1967, and two three-year policies from June 30, 1967, to June 30, 1973.  The policies covered personal injury and

property damage up to $1 million per occurrence but with much lower limits ($25,000, later $100,000) for losses from "gradual pollution."

Between October 20, 1962, and June 30, 1974, Commercial Union's predecessors in interest provided excess liability coverage to Grace--that is, coverage starting at the point that the Maryland policies left off--in the form of four successive multi-year umbrella policies. (The first, second and fourth policies each ran for three years; the third ran for about two years and eight months.) The policies provided coverage in the amount of $5 million for each "occurrence," defining "occurrence" to include "an event, or continuous or repeated exposure to conditions, which unexpectedly results in personal injury [or] property damage" during the policy period, and continued:

> [A]ll personal injury and property damage . . . arising out of one event or continuous or repeated exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed to be one occurrence.

The Commercial Union policies also included clauses, known as "follow-the-form" clauses, that are designed to make coverage under a higher-tier policy (here, Commercial Union's) conform--subject to certain qualifications--to the coverage provided by the underlying policy (here, Maryland's policies). See 2 Ostrager & Newman, Handbook on Insurance Coverage Disputes § 13.01[a], at 868 (12th ed. 2004). Thus, in the first two policies,

the follow-the-form language provided that "the terms, conditions and limitations of this policy will not be construed any more restrictive [sic] than the terms, conditions and limitations of Underlying Insurance."  The latter two provided:

> [s]uch coverage as is afforded by this policy shall apply to occurrences covered by the terms and conditions of [the underlying policy] or by the terms of conditions of this policy except that the definition of Property Damage as contained in this policy shall apply.

The top tier of coverage in this case was provided by Swiss Re, which offered not insurance for Grace but "reinsurance" to Commercial Union.  Swiss Re agreed, under specified conditions, to indemnify Commercial Union for specified losses it might suffer under its excess insurance policies.  The form of reinsurance used, called "facultative," covers risks that the "cedent" (here, Commercial Union) bears under a specific policy or policies.  2 Ostrager & Newman, supra, § 15.03[a], at 996-97.

Swiss Re issued three multi-year "certificates" to Commercial Union, corresponding to each of the last three (out of a total of four) multi-year excess liability policies that Commercial Union had written for Grace, i.e., roughly for the period 1965 to 1974.  Each Swiss Re certificate was skeletal, identifying the Commercial Union excess liability policy in question and agreeing to share a specified portion of Commercial Union's liability to Grace.  Specifically, under the first

-4-

certificate Swiss Re agreed to share 50 percent of Commercial Union's first $1 million in loss for "each occurrence"; under the second, 50 percent of the first $500,000; under the third, 37.5 percent of the first $500,000.

Each certificate contained on the back side several standard conditions. These included variously phrased follow-the-form clauses saying that--except as "otherwise specifically provided" in the certificate--Swiss Re's liability would "follow" or "be subject" to the "terms and conditions" of Commercial Union's policies. Thus, through follow-the-form clauses, Swiss Re's policies looked back to Commercial Union's, and the latter's policies looked back to Maryland's policies with Grace.

In addition, the Swiss Re certificates contained "follow-the-fortunes" provisions, which--where the case involves settlements--are sometimes called "follow-the-settlements" clauses. Such provisions are designed to give the cedent reasonable latitude to settle claims against it by the primary insured and to bind the reinsurer (in some measure) from contesting the extent of the cedent's liability to the primary insured. See Ostrager & Vyskocil, Modern Reinsurance Law & Practice §§ 9.01-.02 (1996); Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London, 760 N.E.2d 319, 328 (N.Y. 2001). Here, the follow-the-fortunes clause in each certificate reads as follows:

> All claims involving this reinsurance, when settled by [Commercial Union], shall be

-5-

> binding on [Swiss Re], which shall be bound to pay its proportion of such settlements promptly following receipt of proof of loss.

In the 1980s, Grace began to notify Commercial Union of potential property damage losses due to hazardous waste pollution at various Grace sites. In 1988, Maryland filed a declaratory judgment action in federal district court in New York against Grace seeking to clarify Maryland's obligations under its primary policies. See Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 148-49 (2d Cir. 2003). Commercial Union and other insurers were added to the suit, and eventually the case expanded to involve over 200 waste sites.

In October 1998, Commercial Union settled with Grace based on information about nine "focus" waste sites (out of the forty for which Grace claimed Commercial Union was liable), for a single immediate payment of $57.6 million. The settlement was premised on estimates of projected liability over a substantial period due to damage at each site and on certain assumptions. Two such assumptions were (1) that the hazardous waste liability at each site should be allocated pro rata across the years of relevant insurance coverage at each site and (2) that the $5 million per-occurrence limit in each policy should be viewed as applying separately to each policy year, i.e., $15 million for a three-year policy.

When Commercial Union then sought indemnity from Swiss Re for $13.7 million (out of the $57.6 million paid to Grace), Swiss Re paid less than half that amount. It withheld part of the balance (about $6 million) on the ground that its reinsurance certificates protected it from any calculation of Commercial Union's liability to Grace, or Swiss Re's to Commercial Union, premised on the notion that the per-occurrence limit applied separately to each policy year (as opposed to the entire multi-year policy period). Swiss Re also disputed another aspect of the demand but that issue was apparently settled.

On cross-motions for summary judgment, the district court concluded that Swiss Re was correct on the "annualization" issue. The court held that Swiss Re's liability should be based on the premise that the per-occurrence limit applied once to a continuing leakage at a site over the multi-year policy period and not once for each year of the period. The court deemed this to be an explicit limit in each certificate, overriding any follow-the-form or follow-the-fortunes provision. This appeal by Commercial Union followed.

We review a grant of summary judgment <u>de novo</u>. <u>Commercial Union Ins. Co.</u> v. <u>Walbrook Ins. Co.</u>, 7 F.3d 1047, 1050 (1st Cir. 1993). The present contract-interpretation dispute is governed either by the substantive law of New York or

Massachusetts.[1]  Further, interpretation of an insurance contract is--at least absent extrinsic evidence--a question of law for the court.  See Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 303 n.2 (1st Cir. 2001).  Accord Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 645 N.E.2d 1165, 1168 (Mass. 1995); Sutton v. E. River Sav. Bank, 435 N.E.2d 1075, 1077-78 (N.Y. 1982).

In a dispute between insurers and reinsurers, certain canons of construction that protect purchasers of direct insurance policies do not apply.  Unigard Sec. Ins. Co. v. N. River Ins. Co., 4 F.3d 1049, 1065 (2d Cir. 1993); Boston Ins. Co. v. Fawcett, 258 N.E.2d 771, 776 (Mass. 1970).  Both New York and Massachusetts authorities recognize the operation of follow-the-form and follow-the-fortunes clauses.  See Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 42 (1st Cir. 2000), cert. denied 531 U.S. 1146 (2001); Aetna Cas. & Sur. Co. v. Home Ins. Co., 882 F. Supp. 1328, 1337, 1345-46 (S.D.N.Y. 1995); Metro. Leasing, Inc., v. Pac. Employers Ins. Co., 633 N.E.2d 434, 439 & n.6 (Mass. App. Ct. 1994).  Against this background we turn to the merits of the dispute.

---

[1]The district court determined that the substantive law of either Massachusetts or New York governed the dispute, and that the two did not differ in any pertinent respect.  The parties do not dispute this assessment and, the approach being colorable, we follow suit.  See Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1064 (1st Cir. 1991); see also Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F.3d 42, 46 (1st Cir. 2003).

A good deal about this case, in addition to the ill-worded policies and certificates themselves, remains obscure. Ordinarily, courts construe policy language in relation to specific facts, the policy language drawing meaning in part through interaction with a given fact pattern. Here, by contrast, the briefs tell us very little about what went wrong at any site, although the record modestly describes the actual conditions that gave rise to liability.[2] Seemingly the conditions varied.

On Swiss Re's view of the matter, the leakage at any one site during the three-year period covered by its certificate comprised a single "occurrence." The term "occurrence" is not defined in the Swiss Re certificates but one plausible reading of the term would treat the entire continuous leakage as a single, albeit drawn out, occurrence; and, for such a reading Swiss Re can point to the definition of "occurrence" in the Commercial Union policies quoted above--namely, that continuous exposure to the same condition "shall be deemed to be one occurrence."

If the leakage during the three-year period comprised one occurrence, then Commercial Union's liability to Grace for a three-year leak would be capped at $5 million and Swiss Re's liability to

_____

[2]These included landfills, leaking chemical drums, contaminated lagoons and asbestos-contaminated soil, abandoned drums of industrial waste and leaking storage tanks, plant operations that involved ammonia wastewater being disposed of in unlined pits or injected directly into the ground, improper disposal of pesticide residue, inadvertent spreading of dry waste particles, and buried radioactive rubble.

Commercial Union would be $500,000 (50 percent of the first $1 million).  By contrast, if leakage during each year in the three-year period were treated as a separate occurrence, or (put differently) the cap applied year by year, Swiss Re could be liable for $1.5 million ($500,000 times three).  The settlement with Grace assumed the latter view of the matter.

If the question were considered as a mechanical exercise in language--without the aid of "follow" clauses or policy arguments--Swiss Re might well have the stronger argument, just as the district court found.  The policy period is three years, the continuous release of the one pollutant at one site can easily be described as one occurrence.  So Swiss Re could be seen as merely insisting--in reliance on its own certificate's "per occurrence" language--on a cap of $500,000 in reinsurance for a single occurrence.

A number of cases construing multi-year policies, and applying varying language to different factual scenarios, have construed caps in the fashion urged by Swiss Re and have rejected "annualization" glosses of the kind pressed by Commercial Union.[3] Only New Jersey has suggested an annualization approach may

---

[3]See, e.g., Soc'y of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co., 26 F.3d 1359, 1366 (5th Cir. 1994); Bd. of Trs. of Univ. of Ill. v. Ins. Corp. of Ire., Ltd., 750 F. Supp. 1375, 1376, 1380-81 (N.D. Ill. 1990); Hercules, Inc. v. AIU Ins. Co., 784 A.2d 481, 495-96 (Del. 2001).

normally apply. See, e.g., Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 843 A.2d 1094, 1103 (N.J. 2004); Owens-Illinois, Inc. v. United Ins. Co., 650 A.2d 974, 995 (N.J. 1994). But for the most part the "majority view" cases did not implicate follow-the-form and follow-the-settlement clauses, and those clauses make a difference in our case.

Let us start with Commercial Union's liability to Grace. Commercial Union's own policies contained language in their definition of occurrence quoted above, hostile to annualization. Yet the multi-year Maryland policies explicitly provided for their per occurrence limits to apply on an annual basis, as did the earlier one-year policies. So Grace could argue in any litigation with Commercial Union that the latter's obligations were governed by the former's policy given that Commercial Union's excess insurance policies contained a strong follow-the-form clause of its own.

Specifically, the follow-the-form provisions in Commercial Union's excess liability policies state (in one form) that the excess policy is no more restrictive than the Maryland policy and (in the other) that Commercial Union would cover any occurrences covered by the Maryland policy. Thus in Hatco Corp. v. W.R. Grace & Co., 801 F. Supp. 1334, 1354-55 (D.N.J. 1992), the court held that a particular exclusion in Commercial Union's policy was overridden by the follow-form provision as construed in favor

-11-

the insured.  So, although New Jersey law has no application here, arguably Commercial Union's policy language should be read to dovetail with Maryland's policy, i.e., by applying the caps on the same annualized basis.[4]

Commercial Union's outside coverage counsel conducted a study of its excess liability policies and pertinent case law, reaching various tentative conclusions (at times concluding that annualization was unlikely, and at other times concluding that variations in language made annualization likely under some of Commercial Union's policies but not under others).  In the end, counsel concluded in a settlement analysis and recommendation that annualization was a likely outcome in the then-ongoing New York law suit between the parties.

Whether this view of Commercial Union's liability to Grace is correct or not, it is binding upon Swiss Re under its follow-the-fortunes clause so long as the settlement was reasonable and made in good faith.  The follow-the-fortunes doctrine, designed in part to encourage settlement, see N. River Ins. Co. v. CIGNA

---

[4]See, e.g., Associated Int'l Ins. Co. v. Blythe, 286 F.3d 780, 782 (5th Cir. 2002) ("The Associated Policy, as a 'following form' policy, adopted the coverage provisions and definitions of the underlying Progressive Policy."); Coleman Co. v. Cal. Union Ins. Co., 960 F.2d 1529, 1533-34 (10th Cir. 1992) (noting that follow-the-form clause "manifests an intent to consider the underlying policy in determining the coverage under the umbrella policy," and concluding that the amount of loss in the excess policy should be computed according to the method in the primary policy).

Reinsurance Co., 52 F.3d 1194, 1206 (3d Cir. 1995), encompasses settlements that are arguably beyond the strict limits of the underlying cedent's policy (i.e., the Commercial Union policies). The reinsurer must abide by cedent's "good-faith payment" so long as it is "arguably within the scope of the insurance coverage". Mentor Ins. Co. (U.K.) v. Brannkasse, 996 F.2d 506, 517 (2d Cir. 1993).[5]

The premise that the settlement was based on annualized per-occurrence limits for Commercial Union, which could in theory be debated, cf. Employers Reinsurance Corp. v. NewCap Ins. Co., 209 F. Supp. 2d 1184, 1190-91 (D. Kan. 2002), is supported by several factors: testimony that some components in Grace's settlement demands could not have been achieved without annualization, testimony that Grace's representatives said during settlement that their valuation used a "pro rata annualized" approach, and the use of annualization as a premise in the ultimate settlement analysis and recommendation by Commercial Union's coverage counsel. Swiss Re apparently pursued the issue during discovery but has not developed any objection on appeal.

---

[5]N. River Ins. Co. v. ACE Am. Reinsurance Co., 361 F.3d 134, 139-40 (2d Cir. 2004); Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992); Aetna, 882 F. Supp. at 1346-47; Int'l Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London, 868 F. Supp. 917, 920-21 (S.D. Ohio 1994).

Of course, if the settlement were flatly inconsistent with the excess liability policy, Swiss Re would not be bound to respect it by a follow-the-settlements clause in its own certificate. N. River Ins. Co., 52 F.3d at 1212 ("Was the paid risk clearly outside the scope of the original policy's coverage?"); Aetna, 882 F. Supp. at 1347 ("manifestly outside" the cedent's policy). But each Commercial Union policy as a whole includes not only its own anti-annualization language but its own follow-the-form clause, seemingly invoking the pro-annualization language of the underlying Maryland policy. Further, the insured would benefit from the usual canons of interpretation favoring the policy holder.

This brings us to Swiss Re's liability to Commercial Union under the terms of the reinsurance certificates. Even if Commercial Union were deemed liable to Grace, Commercial Union's right to the indemnity from Swiss Re is only for a specified share of Commercial Union's liability (e.g., 50 percent of the first $1 million) for "each occurrence." The "occurrence" language delimits Swiss Re's liability; the question is what the "each occurrence" language means.

The district court read the phrase as if it meant, for a multi-year leak, that the leak was a single occurrence for the entire policy period so that the $500,000 cap applied once for the policy period. This is a defensible reading, as the cases cited

-14-

above show, but one could also call the continuing leak a new occurrence every day or every drop. Or one could, as New Jersey seemingly does, adopt a prudential compromise reading that treated it as an occurrence for each year regardless of policy period.

The Swiss Re certificates could have contained a definition of "occurrence" in relation to continuing leaks, expressly negating annualization, but Swiss Re chose to provide no definition at all for this malleable word. Of course, one could read the Swiss Re policy as adopting the Commercial Union definition of the term via Swiss Re's follow-the-form clauses--but which Commercial Union's definition? The explicit anti-annualization reading based on the occurrence definition or the pro-annualization follow-the-form version drawing on the Maryland policies' annualization provisions?

Here, Commercial Union's liability to Grace has been established by a seemingly reasonable settlement made (so far as we know) in good faith. Under Swiss Re's follow-the-settlements clause it is bound to accept this pro-annualization reading of the Commercial Union policy for purposes of establishing Commercial Union's liability to Grace. In our view, Swiss Re's follow-the-form clause should be deemed to extend this reading into the parallel language in Swiss Re's own certificates subject only to any <u>clear</u> limitation to the contrary in the Swiss Re documents.

This view of the matter accords with the basic presumption of concurrence that we think exists where there is a skeleton reinsurance contract coupled with follow-the-form and follow-the-settlements clauses. According to a New York case, consistent with other authorities,

> [w]here a following form clause is found in the reinsurance contract, concurrency between the policy of reinsurance and the reinsured policy is presumed, such that a policy of reinsurance will be construed as offering the same terms, conditions and scope of coverage as exist in the reinsured policy, i.e., in the absence of explicit language in the policy of reinsurance to the contrary.

Aetna, 882 F. Supp. at 1337. Accord Ostrager & Vyskocil, supra, § 2.03[a], at 2-9. Indeed, concurrence advances one of the basic purposes of reinsurance, which is "[s]preading" risk to prevent "a catastrophic loss from falling upon one insurer." Unigard, 4 F.3d at 1053.

Of course, if sufficiently clear, specific limits in the certificate control over the general aim of concurrence and ordinary "follow" clauses.[6] Unfortunately for Swiss Re, the key "reinsurance accepted" provision in the certificate--which reads

_____

[6]See, e.g., Unigard, 4 F.3d at 1070-71 (follow-the-form); Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co., 903 F.2d 910, 914 (2d Cir. 1990) (follow-the-fortunes); Travelers, 760 N.E.2d at 328 n.9 ("[A] 'follow-the-fortunes' clause does not supersede specific language in a reinsurance contract . . . ."); see also Ostrager & Vyskocil, supra, § 2.03[a], at 2-9 (following-form reinsurance contract incorporates terms of the reinsured policy "to the extent they are not inconsistent with the express terms of the reinsurance contract").

"50% Quota Share part of first $1,000,000 each occurrence"--is simply cryptic as applied to continuing leaks over a multi-year period under a multi-year policy. In such a situation, the balance is tipped in favor of making Swiss Re share liability on a basis that conforms its liability to that of the cedent where the cedent has settled reasonably and in good faith.

Neither side has pointed to extrinsic evidence--such as premium comparisons, expert testimony, or pertinent negotiations--that could illuminate this dispute. Nothing we have said in this decision should be taken to control a case in which a similar dispute is better illuminated by extrinsic evidence of any kind. See, e.g., Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa, 388 F.3d 15, 20-21 (1st Cir. 2004).

It is unclear from the briefs and the record what consequence our conclusions entail beyond a remand. For example, we do not know if the question whether the settlement was made in good faith is at issue, Aetna, 882 F. Supp. at 1351-52. Such matters are for the parties and the district court to sort out on remand.

The judgment of the district court is vacated and the matter remanded for further proceedings consistent with this decision.

It is so ordered.