633 S.E.2d 326

**Walter GAUZE, Plaintiff Below, Appellee**

v.

**Chidetta REED and National Union Fire Insurance Company, Defendants Below.**

**National Union Fire Insurance Company, Appellant.**

**No. 32787.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 24, 2006.

Decided July 5, 2006.

Concurring Opinion of Justice Benjamin July 11, 2006.

Susan Van Zant, Esq., Williamson, Attorney for Appellee Walter Gauze.

Charles R. Bailey, Esq., Mark E. Troy, Esq., Tammy Bowles Raines, Esq., Bailey & Wyant, Charleston, Attorneys for Appellant National Union Fire Insurance Company.

Glen A. Murphy, Kathlene Harmon–McQueen, Esq., McQueen, Harmon & Murphy, Charleston, Attorneys for Appellee Chidetta Reed and the West Virginia Insurance Guaranty Association.

STARCHER, J.:

In this appeal from the Circuit Court of Mingo County, we are asked to resolve an insurance coverage dispute between an insurance company and the West Virginia Insurance Guaranty Association.

## I.

### Facts & Background

This dispute arises from a single-car accident that occurred on September 4, 2001. The complaint filed by the plaintiff-below, Walter Gauze, alleges that the defendant-below, Chidetta Reed, was the driver of the

vehicle. The plaintiff contends that Ms. Reed negligently operated a 1993 Ford Escort Wagon, veered off the road and collided with an embankment. The plaintiff claims that he was a passenger in the vehicle, and that he was found lying on the side of the road after being ejected. It appears that Ms. Reed left the accident scene before emergency personnel arrived. Mr. Gauze alleges he has incurred substantial medical bills and other damages as a result of the accident.

The vehicle involved in the accident was owned by the Human Resource Development Foundation ("HRDF"), a non-profit agency and an administrator of the state-funded "Wheels to Work Program." The program provided lower income applicants with transportation for job purposes. The vehicle was leased to the defendant, Ms. Reed, on July 31, 2001 under a lease-to-own agreement. In the lease agreement, HRDF acknowledged sole ownership of the vehicle and agreed to provide insurance coverage on the vehicle.

HRDF purchased an automobile liability insurance policy for the vehicle from Oak Casualty Insurance Company, and designated both HRDF and Ms. Reed as insureds. HRDF purchased coverage with $100,000.00 in per person liability limits. Unfortunately, after the accident—on November 19, 2002—Oak Casualty was declared insolvent and liquidation was ordered by the Circuit Court of Cook County, Illinois. As a result of the insolvency order, the appellee West Virginia Insurance Guaranty Association ("Guaranty Association") stepped into Oak Casualty's place and assumed the defense of Ms. Reed.

As a non-profit agency, HRDF also qualified for insurance coverage provided through the State of West Virginia by the Board of Risk and Insurance Management, as authorized by *W.Va.Code*, 29–12–5 [2004].[1] The Board of Risk and Insurance Management purchased automobile liability insurance for vehicles owned by HRDF—including the vehicle leased to Ms. Reed—from the appellant, National Union Fire Insurance Company ("NUFIC").

The statutes which create the Guaranty Association require that a plaintiff exhaust all potential solvent sources of insurance coverage before recovering from the Guaranty Association. *W.Va.Code*, 33–26–12(a) [1970] mandates that "any person having a claim against a solvent insurer ... shall be required to exhaust first his right under such solvent insurer's policy" before seeking a recovery from the Guaranty Association. This provision is commonly referred to as the non-duplication provision of the Insurance Guaranty Association Act.

In accordance with the non-duplication provision, on August 18, 2004, the Guaranty Association filed a motion to compel Mr. Gauze to serve the other solvent insurer of the Wheels to Work Program.[2] Specifically, the Guaranty Association claimed that the liability policy provided by NUFIC to HRDF contained solvent coverage for the plaintiff's claims, and that the NUFIC policy limits would have to be exhausted before any compensation could be recovered from the Guaranty Association. In response, the plaintiff filed a notice with the circuit court claiming he was entitled to benefits under the policy issued by NUFIC.

---

1. *W.Va.Code*, 29–12–5(b)(2) [2004] states, in pertinent part:

> If requested by ... a charitable or public service organization ... the board may, but is not required to, provide property and liability insurance to insure the property, activities and responsibilities of the ... charitable or public service organization ... The board may enter into any contract necessary to the execution of the powers granted by this article or to further the intent of this article.

The statute, *W.Va.Code*, 29–12–5(b)(1)(B), defines a "charitable" or "public service organization" as including

> any bona fide, not-for-profit, tax-exempt, benevolent, educational, philanthropic, humane, patriotic, civic, religious, eleemosynary, incorporated or unincorporated association or organization or a rescue unit or other similar volunteer community service organization or association, but does not include any nonprofit association or organization, whether incorporated or not, which is organized primarily for the purposes of influencing legislation or supporting or promoting the campaign of any candidate for public office[.]

2. In accordance with *W.Va.Code*, 33–26–12, plaintiff Gauze also sought and received $35,000.00 in uninsured motorist coverage which was available under his mother's automobile insurance policies.

NUFIC filed a notice of appearance with the circuit court, and shortly thereafter filed a detailed motion for summary judgment. Documents filed in the record by NUFIC admit that HRDF was named as an insured on its "comprehensive auto liability policy" at the time the accident occurred. As the "certificate of liability insurance" provided by NUFIC stated:

> This certifies that [Human Resource Development Foundation of Morgantown, West Virginia] ... is an Additional Insured for the Coverage indicated below under General Liability Policy GL 6124594 and Automobile Policy CA 5348561 issued to the State of West Virginia by NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA.
>
> This certificate presents a summary of coverage. The policies may be inspected at the office of the Board of Risk and Insurance Management ... South Charleston, WV ... during its regular business hours. Reproduction of the policies shall be at cost.

The certificate of liability insurance stated that the limits of liability were "$1,000,000 each occurrence."

NUFIC argued, however, that its policy did not provide liability insurance coverage for the plaintiff's claim. NUFIC contended that its policy was an "excess" insurance policy rather than a primary liability insurance policy. NUFIC pointed to "other insurance" language contained in the certificate of liability insurance indicating that if HRDF "has other primary insurance" from another source, then there was no coverage provided by NUFIC's policy except to the extent that the "amount of loss exceeds the limit of liability" of the other primary insurance policy.[3] NUFIC therefore argued that because HRDF had purchased other primary insurance from Oak Casualty, and the Guaranty Association had assumed responsibility for Oak Casualty's policy once the company was declared insolvent, then the Guaranty Association was responsible for providing the primary liability insurance coverage for Ms. Reed's negligence. NUFIC argued that it provided only excess insurance coverage to HRDF, and that its responsibility under the policy would only be triggered when the Guaranty Association had exhausted its obligation to provide primary coverage.

The Guaranty Association responded to NUFIC's motion for summary judgment by filing its own motion for summary judgment. The Guaranty Association argued that the NUFIC policy explicitly defines the coverage provided as "primary" for any covered auto owned by the insured. The policy stated, under the title "other insurance:"

> For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance.

The policy defined HRDF as an additional insured. The Guaranty Association therefore asserted that because HRDF owned the auto involved in the accident, the coverage under the NUFIC policy was primary liability coverage by the policy's own terms and conditions. The Guaranty Association also noted that the language of the NUFIC policy was ambiguous, and should be construed against NUFIC.

---

**3.** The NUFIC certificate of liability insurance stated:

> If the Additional Insured has other primary insurance for the hazards covered by the above policies, the coverage afforded by this certificate does not apply to losses occurring before the expiration or termination date of the other insurance except to the extent that the amount of loss exceeds the limit of liability of the other insurance, but then only for an amount not exceeding the difference between $1,000,000 and the limit of liability of the other insurance.

Furthermore, NUFIC refers to "Amendatory Endorsement # 10" within the insurance policy, which modifies the policy's "business auto coverage form." The endorsement also contains an "other insurance" provision which states:

> If an "insured" has other primary insurance for the hazards covered by this insurance, this insurance does not apply to losses occurring before the expiration or termination date of the other insurance except to the extent that the amount of loss exceeds the limit of liability of the insurance, but then only for an amount not exceeding the difference between any higher applicable limit of liability stated in the schedule of this policy and the limit of liability of the other insurance.

In an order dated February 15, 2005, the circuit court granted the Guaranty Association's motion for summary judgment, and denied the motion filed by NUFIC. The circuit court rejected NUFIC's argument that its policy was nothing more than an excess liability insurance policy that was intended to provide coverage only after Oak Casualty had fulfilled its obligations. The circuit court concluded that the terms of the NUFIC policy:

> ... identify it as a primary insurer.... Thus, the plain language of the policy is such that it provides primary insurance to automobiles owned and operated by the insureds, the Foundation and Ms. Reed.

NUFIC now appeals the circuit court's February 15, 2005 summary judgment order.

## II.

### Standard of Review

■■■■ This case involves an order by the circuit court granting summary judgment to the Guaranty Association, and denying summary judgment to NUFIC. The standard of review of a circuit court's entry of summary judgment is *de novo.* Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). It is equally well-established that, as here, "[t]he interpretation of an insurance contract ... is a legal determination which, like the court's summary judgment, is reviewed *de novo* on appeal." *Murray v. State Farm Fire & Cas. Co.,* 203 W.Va. 477, 482, 509 S.E.2d 1, 6 (1998). *See also,* Syllabus Point 2, *Riffe v. Home Finders Associates, Inc.,* 205 W.Va. 216, 517 S.E.2d 313 (1999) ("The interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of

summary judgement, shall be reviewed *de novo* on appeal.").

## III.

### Discussion

■■■■ The West Virginia Insurance Guaranty Association Act, *W.Va.Code,* 33–26–1 to –19, creates a means by which insureds are afforded a remedy for their "covered" claims in the event their insurer becomes insolvent.[4] The Guaranty Association created by the Act is not an insurance company. It does not collect premiums or issue policies. Instead, it is a non-profit organization to aid individuals when an insurance carrier cannot satisfy its contractual obligations to the individual due to insolvency. *See generally, Cannelton Industries, Inc. v. Aetna Cas. & Sur. Co. of America,* 194 W.Va. 203, 206–207, 460 S.E.2d 18, 21–22 (1994)

NUFIC argues—citing to numerous state court decisions from around the country—that when a primary liability insurance company is insolvent, the law is clear that an excess insurance company's policy does not "drop down" to take the place of the primary liability insurance policy. NUFIC argues that in most jurisdictions, a state's insurance guaranty association must step into the place of the primary insurance company and fulfill the obligations under the primary insurance policy. Only if those obligations are completely fulfilled, NUFIC argues, is an excess insurance company's obligation to provide coverage triggered.

NUFIC argues that the insurance policy that it issued to HRDF clearly and unambiguously contains an amendatory endorsement that converts its policy from a primary liability insurance policy into an excess insurance policy. In sum, NUFIC argues that the

---

4. As we stated in Syllabus Point 2 of *DeVane v. Kennedy,* 205 W.Va. 519, 519 S.E.2d 622 (1999):

When a claimant or an insured wishes to enforce a covered claim, as defined by W.Va. Code § 33–26–5(4) (1985) (Repl.Vol.1996), for insurance benefits against an insolvent insurer and to recover such insurance proceeds, as permitted by W.Va.Code § 33–26–8(1)(a) (1985) (Repl.Vol.1996), from the West Virginia Insurance Guaranty Association, W.Va.Code § 33–26–12(1) (1970) (Repl.Vol.1996) requires him/her first to exhaust all other sources of

solvent insurance which collaterally insure the covered claim. Once the claimant or insured has exhausted all other sources of solvent insurance which collaterally insure the covered claim or where there exists no other solvent insurance which provides coverage for the covered claim, he/she is entitled to enforce his/her covered claim against the West Virginia Insurance Guaranty Association, to the extent allowed by W.Va.Code § 33–26–8(1)(a) (1985) (Repl.Vol.1996).

insurance policy it sold to HRDF was purely an excess insurance policy, and that the Guaranty Association is therefore obligated to provide liability insurance coverage to HRDF and Ms. Reed. NUFIC asserts that only after the Guaranty Association's obligation is completed (in this case, by the exhaustion of the $100,000.00 liability limits of the Oak Casualty policy) does NUFIC have any obligation to provide excess coverage.

The Guaranty Association responds by pointing out that this case is governed, first and foremost, by state law and not by the provisions of any insurance policy. The Guaranty Association argues that the West Virginia Insurance Guaranty Association Act is to be "liberally construed," *W.Va.Code*, 33–26–4 [1970], so as to afford insureds a remedy for their "covered claims" under a solvent insurance company's policy first, and the Guaranty Association's assets second. *W.Va. Code*, 33–26–12.

▆ The Guaranty Association further argues that the NUFIC policy is not a "true" excess insurance policy. Instead, the Association argues that the NUFIC policy is a primary liability insurance policy that contained "other insurance" policy language. This "other insurance" policy language suggests that if there is "other insurance" available to an insured, then the NUFIC policy becomes a secondary liability insurance policy. The Guaranty Association argues that this "other insurance" policy language is provisional, that is, it indicates that NUFIC provides secondary, excess coverage only if there is other primary coverage available. Because Oak Casualty is insolvent, the Guaranty Association asserts that there is no other primary coverage available—and therefore, that NUFIC once again becomes, by operation of its own policy language, the primary liability insurer that covers Ms. Reed's accident. We agree.

The parties' arguments in this case focus upon "primary" insurance policies and "ex-

cess" insurance policies. These terms are generic, insurance industry labels, but a sufficient definition of the two policies is this:

> A primary policy provides the first layer of insurance coverage. Primary coverage attaches immediately upon the happening of an "occurrence," or as soon as a claim is made. The primary insurer is first responsible for defending and indemnifying the insured in the event of a covered or potentially covered occurrence or claim. Because most losses are within primary policy limits and therefore create greater exposure for primary insurers, and because primary insurers are generally obligated to defend their insureds, primary insurers charge larger premiums for coverage than do excess and umbrella carriers. . . .
>
> An excess policy provides specific coverage above an underlying limit of primary insurance. Excess insurance is priced on the assumption that primary coverage exists: indeed, an excess policy usually requires by its terms that the insured maintain in force scheduled limits of primary insurance. In keeping with the reasonable expectations of the parties, including the insured, which paid separate premiums for its primary and excess policies, excess coverage generally is not triggered until the underlying primary limits are exhausted by way of judgments or settlements. . . .

Douglas R. Richmond, "Rights and Responsibilities of Excess Insurers," 78 Denv. U.L.Rev. 29–30 (2000).

NUFIC correctly argues that many jurisdictions have held that an excess insurance carrier is not required to "drop down" and provide coverage when a primary insurance carrier becomes insolvent. These jurisdictions often hold that the state's guaranty association must "step into the shoes" of the primary insurance carrier and fulfill that carrier's obligations before the excess insurance carrier is obligated to provide coverage.[5] As one treatise stated:

---

5. *See, e.g., North Carolina Insurance Guaranty Association v. Century Indemnity Company,* 115 N.C.App. 175, 444 S.E.2d 464 (1994); *Metropolitan Leasing, Inc. v. Pacific Employers Ins. Co.,* 36 Mass.App.Ct. 536, 633 N.E.2d 434 (1994); *Loui-* *siana Ins. Guar. Assn. v. Interstate Fire & Cas. Co.,* 630 So.2d 759 (La.1994); *Hartford Accident & Indemn. Co. v. Chicago Housing Auth.,* 12 F.3d 92 (7th Cir.1993); *Playtex FP, Inc. v. Columbia Cas. Co.,* 622 A.2d 1074 (Del.Sup.Ct.1992); *Mor-*

Unless insolvency coverage is an express exception, most excess coverage policies clearly condition the obligation of the excess carrier to provide coverage only upon the exhaustion of the primary carrier's limits by payment of claims against the primary coverage, and where this condition is expressed, the courts have ruled that the insolvency of the primary carrier does not activate excess coverage.

Irvin E. Shermer and William Schermer, 2 *Auto.Liability Ins.* § 18:12 [4th Ed.2005].

The reason that a pure excess insurance carrier is not required to drop down in the event of the primary insurer's insolvency is two-fold: insolvency of the underlying insurer(s) is usually not regarded as an "occurrence" as defined by most insurance policies, and excess insurers charge low premiums in exchange for placing the burden of retaining a financially stable primary insurer upon the insured. Put simply, excess insurers are not the guarantors of the solvency of underlying insurers. *See, e.g., North Carolina Ins. Guar. Assn. v. Century Indemn. Co.,* 115 N.C.App. 175, 185–86, 444 S.E.2d 464, 470 (1994) ("[T]he fundamental purpose of excess insurance is to protect the insured against excess liability claims, not to insure against the underlying insurer's insolvency[.]"); *Wurth v. Ideal Mut. Ins. Co.,* 34 Ohio App.3d 325, 518 N.E.2d 607 (1987) (excess insurance does not drop down when primary insurer is insolvent, because to hold otherwise would "place the risk of loss for securing an insolvent insurer not on the insurance purchaser, who purchased the policy, but on the excess coverage provider, who never contracted to cover such a contingency.").

The record, however, clearly shows that the policy provided by NUFIC is not a pure excess insurance policy. The NUFIC policy does not provide specific coverage above a defined underlying limit of primary insurance, and we see nothing in the record to suggest that NUFIC's premiums were priced on the assumption that primary coverage existed. There is also nothing in the NUFIC policy terms indicating that the insured was required to maintain in force certain scheduled limits of primary insurance.

Instead, the NUFIC policy bears all the characteristics of being a primary insurance policy. The policy states that NUFIC would provide the first layer of insurance coverage, unless there was some "other" coverage. Further, it appears that NUFIC charged premiums for the policy that were commensurate with the greater liability exposure of a primary insurance policy, and a primary insurer's duty to provide a defense to the insured.[6]

By virtue of the "other insurance" language in its policy, NUFIC appears to fall within that category of insurers known as a "secondarily liable carrier" rather than an "excess carrier." And the limited authorities on this topic suggest that, when the primary insurance carrier has become insolvent, between an insurance guaranty fund and a secondarily liable carrier, courts suggest that the secondarily liable carrier becomes responsible for payment of the loss.

The leading case on this topic is *Ross v. Canadian Indemnity Ins. Co.,* 142 Cal. App.3d 396, 191 Cal.Rptr. 99 (1983). In *Ross,* the court examined a situation where a plaintiff was injured while loading a truck. Two liability insurance policies covered the plaintiff's claim: an insurance policy on the truck, and an insurance policy on the premises where the truck was being loaded. The premises liability insurer became insolvent, and the California Insurance Guaranty Association ("CIGA") intervened and demanded that the truck's insurer provide coverage for the claim.

The truck's liability insurer in *Ross* argued that it provided only excess and not primary coverage, and cited to statutory language which stated that insurance policies on vehicles being loaded were not primary when there was other insurance. The California

bark *Industries, Inc. v. Western Employers Ins. Co.,* 170 Mich.App. 603, 429 N.W.2d 213 (1988).

6. The record indicates that the one-year automobile liability premium for the policy that covered HRDF was $5,802,610.00. In addition non-prof-

it organizations like HRDF, the policy also covered each West Virginia political subdivision, each West Virginia County Board of Education, and "[s]tudents while operating covered autos for driver training as part of their curriculum."

Insurance Guaranty Association, however, argued that an insurance guaranty association is not statutorily created to be "other insurance."

The California court resolved the question against the truck's liability insurer on public policy grounds, stating:

> We resolve this dilemma by reference to the public policy considerations involved in the creation of CIGA in its role of protecting the public from insolvent insurers. CIGA is a compulsory association of insurers created by statute whose purpose is to provide insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies....
>
> In our view, CIGA was created for the protection of the public. Thus, when a secondary insurer is available in the event of an insolvent primary insurer, the secondary insurer should be responsible in the absence of specific language to the contrary. The secondary insurer has received a premium for the risk and thus the secondary insurer, and not CIGA, should be responsible for the coverage of the loss.

142 Cal.App.3d at 403–404, 191 Cal.Rptr. at 103–104 (citations and quotations omitted). *In accord, Oliver v. Oklahoma Prop. & Cas. Insurance Guar. Assn.,* 774 S.W.2d 902, 904 (Mo.App.1989); *Harrell v. Reliable Ins. Co.,* 258 Ill.App.3d 728, 731, 197 Ill.Dec. 293, 631 N.E.2d 296, 298 (1994) ("The reasoning ... comports with the Illinois legislature's intention that whenever possible, potential claims against the Fund's assets should be reduced by a solvent insurer, rather than the Fund. Insurance associations such as the fund are created for the purpose of providing a limited form of protection to the public and not to insurance companies.").

■ The non-duplication of recovery statute in our Insurance Guaranty Association Act, *W.Va.Code,* 33–26–12, clearly states that any liability under the Act is reduced by the amount of "any recovery" under *any* policy of a solvent insurer. The statute does not distinguish between primary and secondary coverage. *See Rinehart v. Hartford Cas. Ins. Co.,* 91 N.C.App. 368, 371 S.E.2d 788 (1988) ("The statute does not distinguish between primary and secondary coverage or between an operator's policy and an uninsured motorists provision.").

■ The Guaranty Association is a compulsory association of insurers created by statute "to provide a mechanism for the payment of covered claims ... to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer[.]" *W.Va.Code,* 33–26–2 [1970].[7] The Guaranty Association was created to protect the public from insolvent insurance carriers, not to protect insurance carriers from other insurance carriers. In our view, when an insurance company (a) issues a primary liability insurance policy; and (b) has contracted for and received a premium for a risk as though it were a primary insurer; but (c) the insurance company has become a secondary insurer by operation of an "other insurance" clause in the policy and the existence of another primary insurance carrier, then if that other insurance carrier is declared insolvent, the insurance company is responsible for coverage of the loss as though it were the sole primary liability insurer. In other words, the secondary insurer and not the Guaranty Association should bear the loss.

■ The record in the instant case plainly shows that NUFIC issued a primary insurance policy upon the vehicle owned and operated by HRDF and Ms. Reed. It further appears that premiums were paid, not for excess coverage as NUFIC argues, but for primary insurance coverage as the Guaranty Association argues. While the NUFIC policy suggests that the policy becomes a secondary excess policy if there is "other primary insurance," the record establishes that there is no other primary insurance because Oak Casualty is insolvent. NUFIC must therefore provide coverage for the loss as though it were the sole primary liability insurance carrier.

---

7. Other purposes of the Guaranty Association Act are "to assist in the detection and prevention of insurer insolvencies, and to provide an associa- tion to assess the cost of such protection among insurers." *W.Va.Code,* 33–26–2.

Accordingly, we find no error in the circuit court's order, and National Union Fire Insurance Company and not the West Virginia Insurance Guaranty Association should bear any loss.

## IV.

The circuit court's February 15, 2005 order is affirmed.

Affirmed.

BENJAMIN, Justice, concurring:

(Filed July 11, 2006)

I write separately to emphasize the extremely narrow holding reached by the Court in this matter, a holding necessitated by the unique circumstances presented herein. In this case we are presented with the rare situation wherein two primary insurance policies were purchased to provide liability coverage for the same automobile. One policy was issued by Oak Casualty Insurance Company ("Oak Casualty"), the other by appellant National Union Fire Insurance Company ("National Union"). Subsequent to the accident at issue herein, an Illinois court declared Oak Casualty to be insolvent and ordered its liquidation. As a result, no coverage was available under the Oak Casualty policy to respond to Gauze's claim and to defend Reed in the related underlying civil action brought against her by Gauze. Therefore, the West Virginia Insurance Guaranty Association ("Guaranty Association"), a statutory entity, was statutorily required to become involved in place of Oak Casualty in the defense of the Guaze lawsuit. The Guaranty Association also sought to determine whether any other available insurance existed to satisfy the Guaze claim. Pursuant to statute, all other insurance available to satisfy a "covered claim" must be exhausted before the Guaranty Association may pay a "covered claim" asserted against an insolvent insurer. W. Va.Code § 33–26–12 (1970).

Despite policy language that it "provides primary insurance" for "any covered 'auto' you own,"[1] National Union contends that its policy's "other insurance" provisions operate to avoid requiring it to respond to Mr. Gauze's claim and to defend Ms. Reed. According to National Union, its policy does not provide coverage for the "covered claim" herein because the existence of the Oak Casualty policy, regardless of the solvency of Oak Casualty, converted the National Union policy from a "primary" policy to an "excess" policy.[2] Were the National Union policy indeed an "excess" policy, its argument would have merit. However, the plain terms of National Union's policy language declare that it provides primary coverage arising from operation of the vehicle involved in the Gauze accident.

Thus, this Court is presented with the unusual situation wherein two primary liability insurance policies were purchased to cover the same vehicle. In West Virginia, primary insurance coverage follows the vehicle, not the driver. *Allstate Insurance Company v. State Automobile Mutual Insurance Company*, 178 W.Va. 704, 707, 364 S.E.2d 30, 33 (1987) (where two policies of insurance provide liability coverage for an automobile accident and contain competing "other insurance" provisions, the policy insuring *the vehicle* is to provide primary coverage and the policy insuring the driver becomes excess). The National Union policy at issue herein provided primary liability coverage for the accident at issue both under its own terms and under West Virginia law. Had Oak Casualty remained solvent, an examination of competing "other insurance" provisions contained in both the Oak Casualty policy and the National Union policy would have been

---

1. National Union's policy contained the following provision in the section discussing "other insurance."

   For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this coverage form is excess over any other collectible insurance.

   The Human Resource Development Fund was both the owner of the vehicle at issue in this

   litigation and an insured under the National Union policy. Even if the insured did not own the vehicle, the policy would still be primary as there is no other *collectible* insurance due to Oak Casualty's insolvency.

2. It is undisputed that excess policies of insurance do not "drop down" to provide primary coverage when the primary insurer becomes insolvent.

necessary to determine how liability should be apportioned between the two. However, Oak Casualty's insolvency eliminates the need for this task. Since no other solvent, primary policy exists, National Union's policy is the sole primary policy available to respond to the Guaze claim. The Guaranty Association is statutorily prohibited from paying claims unless all other available insurance covering the claim is exhausted. Because National Union's policy is a primarily liability policy, its insurance policy is required to be exhausted before the Guaranty Association's obligation is triggered. If the value of Mr. Gauze's claim exceeds the National Union policy limits, the Guaranty Association would then be required to provide coverage up to statutory limits and subject to statutory offset requirements. *See* W. Va. Code § 33-26-12.