FILED
United States Court of Appeals
Tenth Circuit

April 21, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

In re: ARAMARK LEISURE
SERVICES, as owner of a certain
1997 19' Mirage Runabout for
exoneration from or limitation of
liability,

      Plaintiff,

v.

CHARLES F. KENDRICK,

      Claimant/Third Party Plaintiff -
Appellee,

v.

ALBANY INSURANCE COMPANY,

      Third Party Defendant -
Appellant,

------------------------------------------------

TRACI A. SEVY,

      Claimant - Amicus Curiae.

No. 07-4120

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:04-CV-0006-TC)

---

Patrick J. Corbett, Rubin, Fiorella & Friedman, LLP, New York, New York (C.
Richard Henriksen, Jr., Henriksen & Henriksen, Salt Lake City, Utah, with him

on the briefs), for Third Party Defendant-Appellant.

John W. Holt, (Linette B. Hutton with him on the brief), Winder & Haslam, PC, Salt Lake City, Utah, for Claimant/Third Party Plaintiff-Appellee.

Mark T. Ethington, Larson, Turner, Dalby & Ethington, L.C., South Jordan, Utah, for Claimant-Amicus Curiae.

_____

Before **BRISCOE,** and **GORSUCH,** Circuit Judges, and **PARKER**, District Judge.[*]

_____

**BRISCOE**, Circuit Judge.

_____

After renting a boat from Aramark Leisure Services ("Aramark"), Charles Kendrick was involved in a boating accident. Faced with potential damage claims from Kendrick and his co-passenger, Aramark brought a special proceeding in federal district court under the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 30501 *et seq.*[1] As part of that proceeding, Kendrick filed a claim against Aramark, and Kendrick also brought a third-party claim against Aramark's insurer, Albany Insurance Company ("Albany"). Albany responded by arguing

_____

[*] The Honorable James A. Parker, United States District Judge for the District of New Mexico, sitting by designation.

[1] At the time of Aramark's complaint, the Limitation of Vessel Owner's Liability Act was codified at 46 U.S.C. § 181 *et seq.* "The Act provides for the enjoining of pending suits against shipowners and their consolidation in a single federal court so that liability may be determined and limited to the value of the shipowner's vessel and freight pending." Magnolia Marine Transp. Co. v. Oklahoma, 366 F.3d 1153, 1155 (10th Cir. 2004) (citation and internal quotation marks omitted).

2

that Kendrick's personal liability insurance with Shelby Insurance Company ("Shelby") provided Kendrick with primary coverage, and that, pursuant to an "escape clause" in the Albany policy, Albany was not required to extend coverage to Kendrick. While the litigation was ongoing, Shelby became insolvent, and the Utah Property and Casualty Insurance Guaranty Association ("UPCIGA") became potentially responsible for Shelby's obligations. In a letter, the UPCIGA stated that, under the exhaustion provision in Utah Code Ann. § 31A-28-213(1)(a), Albany was required to provide primary coverage to Kendrick. The district court agreed with the UPCIGA, and Albany has appealed. We have jurisdiction under 28 U.S.C. § 1291 and reverse and remand for further proceedings.

I.

On September 1, 2001, Traci Sevy and Charles Kendrick were vacationing together at Lake Powell, in southern Utah. Kendrick rented a 1997 Mirage Runabout boat from Aramark Leisure Services at the Bullfrog Marina. At the time of the rental, Aramark had an insurance policy with Albany Insurance Company. At some point during the rental period, and while Kendrick was operating the boat, it collided with a canyon wall or cliff.[2] The boat was severely damaged, and Sevy sustained serious personal injuries and lost various items of personal property. A few months later, Sevy filed a lawsuit in Utah state court,

---

[2] Sevy contends that Kendrick was intoxicated at the time.

3

alleging claims against Kendrick for negligence and conversion.

Aramark brought a special proceeding under the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 30501 *et seq.*, in the United States District Court for the District of Arizona, asking for exoneration from, or limitation of, any liability resulting from the boating accident. Aramark named Sevy and Kendrick as potential claimants. The case was then transferred to the United States District Court for the District of Utah, where Sevy and Kendrick each filed a notice of claim.

Kendrick also filed a third-party complaint against Albany, alleging that, "[b]y virtue of his rental and use of the Runabout, Kendrick was also insured under the Albany Policy with respect to Sevy's allegation [in Utah state court that] he was negligent." Kendrick Compl., ROA, Vol. I, at 41. Kendrick explained that he had liability coverage under a homeowner's insurance policy with Shelby Insurance Company, and that, "[a]s a result of the existence of Kendrick's homeowners policy with Shelby, Albany has denied coverage and has refused to defend Kendrick in connection with the subject accident." Id. at 42. Kendrick asked the court for a declaratory judgment "that the Albany Policy constitutes primary coverage in connection with the claims asserted by Sevy against Kendrick." Id. at 42.

Albany filed an answer, admitting that it had denied coverage and asserting a host of affirmative defenses. Both Kendrick and Albany filed motions for

4

summary judgment. At issue was the effect of two contractual provisions.  The first provision, in Albany's insurance contract with Aramark, provided:

**15.   Special Conditions**

> Where the Assured is, irrespective of the section, covered or protected against any loss or claim which would otherwise have been paid by this Company, under this section there shall be no contribution or participation by this Company on the basis of excess, contributing, deficiency, concurrent, or double insurance or otherwise.

> Insurance in excess of the limits of liability stipulated herein permitted.

Albany Contract, ROA, Vol. I, at 104.  Albany argued that, because Kendrick was covered under his policy with Shelby, this "escape clause" applied, and the Albany policy did not cover Kendrick.  The second provision at issue, in Shelby's insurance contract with Kendrick, provided:

**8.   Other Insurance – Coverage E – Personal Liability.**  This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

Shelby Contract, ROA, Vol. I, at 135.  Kendrick argued that, under this "excess clause," the escape clause in the Albany policy did not apply, and Albany was Kendrick's primary insurer.  Both parties essentially conceded that, in the absence of the Shelby policy, Albany would have provided primary coverage to Kendrick, and in the absence of the Albany policy, Shelby would have provided primary coverage to Kendrick.

After the parties filed their cross-motions for summary judgment, but before the district court held a hearing, Shelby became insolvent. On August 1, 2006, a Texas state court issued an order placing Shelby into liquidation. Kendrick filed a motion to dismiss or stay the action, arguing that the Texas state court's liquidation order prevented the case from going forward. Albany opposed the motion, arguing, in part, that Shelby was not a party to the case. Kendrick replied that, although Shelby was not named as a party, it had been prosecuting the action on Kendrick's behalf.

At a hearing on September 19, 2006, the district court indicated that, "if there were no receivership issue, . . . I'm quite inclined to say that the Albany clause is going to prevail probably, and that Shelby would be the primary insurer." Hearing, Supp. ROA, at 12 (citing Utah Power & Light Co v. Fed. Ins. Co., 983 F.2d 1549 (10th Cir. 1993)). The district court explained, however, that "everything change[d]" once Shelby entered liquidation proceedings. Id. at 12-13. Ultimately, the district court declined to rule on the cross-motions for summary judgment, and instead allowed the parties to submit supplemental briefing on the effect of Shelby's insolvency.[3]

The main source of controversy resulting from Shelby's insolvency was the

_____

[3] It is unclear whether the district court addressed Kendrick's motion to dismiss or stay the action.

6

role of the Utah Property and Casualty Insurance Guaranty Association.[4] In

particular, the parties disputed the effect of the following statutory provision:

> Any person who has a claim against an insurer, whether or not the insurer is a member insurer, under any provision in an insurance policy, other than a policy of an insolvent insurer that is also a covered claim, is required to first exhaust that person's right under that person's policy.

Utah Code Ann. § 31A-28-213(1)(a). In a letter dated September 29, 2006, the

UPCIGA stated its position that, under § 31A-28-213(1)(a), the "UPCIGA is

**secondary** to any other insurance coverage," and "Albany Insurance is primary."

UPCIGA Letter, Doc. 78 attachment. Kendrick adopted the UPCIGA's position

in his supplemental brief, arguing that "[t]he obvious purpose of this provision is

to assure that other sources of insurance are all exhausted before the Association

is asked to cover a claim." Kendrick Supp. Br., Supp. ROA, at 28. Albany

countered by contending that "for the same reasons that Shelby is primarily liable

for coverage of Kendrick's claim, [the UPCIGA] is also liable thereon." Albany

Supp. Br., Supp. ROA, at 35.

At a subsequent hearing, the district court adopted the position of the

UPCIGA and Kendrick. The district court explained that the statute is "quite

clear" that "the [Albany] policy must be exhausted," and that the UPCIGA "is a

---

[4] The UPCIGA is a non-profit association, organized under Utah law, that provides payments to policyholders in the event of an insurer's insolvency. See Utah Code Ann. § 31A-28-202 *et seq.*

fund of last resort, a guarantor of last resort." Hearing, Supp. ROA, at 57.

Moreover, while the UPCIGA "to some degree steps into Shelby's shoes, it does

not absolve the fact that Albany is the insured that must pay first." Id. at 57-58.

The district court later entered a written order incorporating its ruling, which is

now appealed.

II.

A.    *Federal subject-matter jurisdiction*

Although neither party contests subject-matter jurisdiction, neither party

provides any analysis of the issue—or even the correct citation to the statutory

provision granting federal subject-matter jurisdiction over admiralty disputes.

Before we address the merits of the case, therefore, we must first determine

whether the federal district court, and likewise this court, has subject-matter

jurisdiction over the dispute between Kendrick and Albany. Mt. Healthy City

Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977) ("[W]e are obliged to

inquire sua sponte whenever a doubt arises as to the existence of federal

jurisdiction.").

Although the dispute between Kendrick and Albany might not, by itself,

fall within our subject-matter jurisdiction,[5] we have subject-matter jurisdiction

---

[5] Perhaps the dispute would fall within our diversity jurisdiction under 28 U.S.C. § 1332, but neither party has explained how or whether the dispute would satisfy the criteria of § 1332, and it is not apparent from the record. See Symes v.
(continued...)

8

over the claim pursuant to 28 U.S.C. § 1333(1) and 28 U.S.C. § 1367.  Section

1333(1) provides the federal courts with subject-matter jurisdiction over

admiralty claims:

> The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
>
>> (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

28 U.S.C. § 1333(1).  In addition, 46 U.S.C. § 30101 clarifies the extent of our

admiralty jurisdiction in cases of damage or injury:

> (a) In general. -- The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

46 U.S.C. § 30101(a).[6]

Pursuant to 28 U.S.C. § 1333(1) and 46 U.S.C. § 30101, the district court

had federal subject-matter jurisdiction over Aramark's original complaint under

the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 30501 *et seq.*  In

Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995),

the Supreme Court addressed the extent of federal admiralty jurisdiction under §

---

[5](...continued)
Harris, 472 F.3d 754, 758 (10th Cir. 2006) ("Under 28 U.S.C. § 1332, a party must show that complete diversity of citizenship exists between the adverse parties and that the amount in controversy exceeds $75,000.").

[6] Section 30101 was previously codified at 46 U.S.C. App. § 740.

1333(1), where a party had filed an action seeking protection under the Limitation of Vessel Owner's Liability Act.[7]  The Court began by explaining:

> A federal court's authority to hear cases in admiralty flows initially from the Constitution, which "extend[s]" federal judicial power "to all Cases of admiralty and maritime Jurisdiction."  U.S. Const., Art. III, § 2.  Congress has embodied that power in a statute giving federal district courts "original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction . . . ."  28 U.S.C. § 1333(1).

Id. at 531 (alterations in original).  The Court then provided the test for determining whether a party may invoke federal admiralty jurisdiction:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity.  A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water.  [46 U.S.C. § 30101.]  The connection test raises two issues.  A court, first, must assess the general features of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce.  Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

Id. at 534 (some citations and internal quotation marks omitted).

In its complaint, Aramark alleged that Kendrick and Sevy were engaged in "recreational boating" on "the navigable waters of Lake Powell, at Bullfrog Bay," when they collided with "a canyon wall or cliff."  Aramark Compl., ROA, Vol. I,

---

[7] At the time of the Grubart decision, the Limitation of Vessel Owner's Liability Act was codified at 46 U.S.C. § 181 *et seq.*  See also supra note 1.

at 20.  Consequently, Aramark's claim readily satisfied <u>Grubart</u>'s "location test."

<u>See</u> <u>Grubart</u>, 513 U.S. at 534-38.  Aramark's claim also satisfied the first of the

"maritime connection enquiries," because the boating collision was an "incident .

. . of a sort with the potential to disrupt maritime commerce."  <u>Id.</u> at 538; <u>see also</u>

<u>id.</u> at 538-39 (noting that "a fire on a vessel docked at a marina on navigable

waters" had satisfied this test in <u>Sisson v. Ruby</u>, 497 U.S. 358, 363 (1990), and

holding that the "damag[e] [to] a structure beneath the riverbed" in <u>Grubart</u> also

satisfied the test, because it could lead to a disruption in the water course itself . .

. and . . . could lead to restrictions on the navigational use of the waterway during

required repairs").  Finally, Aramark's complaint satisfied the second of the

"maritime connection enquiries"—"whether the general character of the activity

giving rise to the incident shows a substantial relationship to traditional maritime

activity"—because it involved "[n]avigation of boats in navigable waters," which

"clearly falls within the substantial relationship."  <u>Id.</u> at 539-40.

 With subject-matter jurisdiction over Aramark's original claim, the district

court appropriately exercised its supplemental jurisdiction, pursuant to 28 U.S.C.

§ 1367, over the third-party insurance dispute between Kendrick and Albany.

Section 1367 provides:

> (a) Except as provided in subsections (b) and (c) or as expressly
> provided otherwise by Federal statute, in any civil action of which
> the district courts have original jurisdiction, the district courts shall
> have supplemental jurisdiction over all other claims that are so
> related to claims in the action within such original jurisdiction that

11

they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Under this provision, a federal court may exercise supplemental jurisdiction over related third-party claims when the court has admiralty jurisdiction over the original claim. See Loeber v. Bay Tankers, Inc., 924 F.2d 1340, 1347 (5th Cir. 1991); Roco Carriers, Ltd. v. M/V Nurnberg Express, 899 F.2d 1292, 1297 (2d Cir. 1990); Moeller v. Mulvey, 959 F. Supp. 1102, 1111 (D. Minn. 1996); Ins. Co. of N. Am. v. S/S Cape Charles, 843 F. Supp. 893, 894-95 (S.D.N.Y. 1994); cf. Grubart, 513 U.S. at 531 ("The parties do not dispute the Seventh Circuit's conclusion that jurisdiction as to Counts II and III (indemnity and contribution) hinges on jurisdiction over the Count I claim." (citing 28 U.S.C. § 1367) (other citations omitted)). The third-party insurance dispute between Kendrick and Albany falls squarely within the terms of 28 U.S.C. § 1367, which, when coupled with 28 U.S.C. § 1333(1) and 46 U.S.C. § 30101(a), provided federal subject-matter jurisdiction here.

B.     *Kendrick's coverage under the Albany insurance policy*

It is a close question whether Albany must provide primary insurance coverage to Kendrick now that Shelby is insolvent. As described above, Shelby's policy stated:

> **8.     Other Insurance – Coverage E – Personal Liability.** This insurance is excess over other valid and collectible insurance

12

except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

Shelby Contract, ROA, Vol. I, at 135. Albany's policy stated:

**15.** **Special Conditions**

Where the Assured is, irrespective of the section, covered or protected against any loss or claim which would otherwise have been paid by this Company, under this section there shall be no contribution or participation by this Company on the basis of excess, contributing, deficiency, concurrent, or double insurance or otherwise.

Insurance in excess of the limits of liability stipulated herein permitted.

Albany Contract, ROA, Vol. I, at 104. Under Utah law,[8]

insurance policies are construed using general contract principles. The interpretation of an unambiguous contract is a question of law to be determined by the court and may be decided on summary judgment. If the policy language is clear and unambiguous, the court must construe it according to its plain and ordinary meaning.

Utah Power & Light Co. v. Fed. Ins. Co., 983 F.2d 1549, 1553 (10th Cir. 1993)

(citations omitted). "Utah courts follow this same course when construing

competing other insurance clauses." Id. at 1559 (citations omitted).[9] Further,

---

[8] All parties and the district court have agreed that Utah law applies, so we need not address whether they are correct. See Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821, 831 & n.4 (10th Cir. 2005).

[9] "In general, an 'other insurance' clause is an insurance contract provision designed to avoid liability for an insurer 'by declaring either that another insurer provides primary coverage or that the insurance contract containing the clause provides no coverage when another insurance coverage applies to the loss.'" Utah Power & Light Co., 983 F.2d at 1558 n.2 (quoting Robert E. Keeton & Alan L.

(continued...)

[t]he Utah courts do not simply categorize other insurance clauses as excess, pro-rata, escape, or excess-escape clauses and apply presumptive rules that one type trumps another. Rather, . . . they give effect to the plain meaning of the clauses' language. Thus, the Utah Supreme Court recognizes the general validity of excess-escape clauses, because the plain language of these clauses generally prevails over the language of other types of clauses. More importantly, [Utah has] interpreted the plain language of an excess-escape clause to prevail over the plain language of an excess clause. Although courts in other jurisdictions may have found good reason to disfavor escape and excess-escape clauses, the Utah Supreme Court has not followed their lead.

Id. at 1560-61 (citations omitted).

If Shelby were not insolvent, then, under our decision in Utah Power & Light Co., 983 F.2d at 1561, our only relevant inquiry would be "the plain meaning of the [Shelby and Albany] clauses' language." For the Shelby clause to trigger, and for the Shelby policy to become excess insurance, rather than primary insurance, the Shelby excess clause requires that "other valid and collectible insurance" be available to Kendrick. Shelby Contract, ROA, Vol. I, at 135. The Albany policy, which contains an escape clause, would not qualify as "other valid and collectible insurance." See Utah Power & Light Co., 983 F.2d at 1561 n.5 ("[W]hen the loss could be covered in full by a policy with an excess clause, other insurance provided by policies with either escape or excess-escape clauses was not 'collectible' insurance that would trigger the competing excess insurance

---

[9](...continued)
Widiss, Insurance Law § 3.11, at 254 (1988)).

clause."). As a result, the Albany policy would "not . . . trigger the competing excess insurance clause [in the Shelby policy]," and Shelby, "with the untriggered excess clause[, would be] liable for the whole loss." Id. Also, the existence of the Shelby policy would trigger the Albany policy's escape clause, resulting in "no contribution or participation by [Albany]" as an insurer of Kendrick. Albany Contract, ROA, Vol. I, at 104. The district court's initial inclination that, in the absence of Shelby's insolvency, "Shelby would be the primary insurer," Hearing, Supp. ROA, at 12, was therefore correct. See Utah Power & Light Co., 983 F.2d at 1560-61.

As the district court recognized, however, the issue is no longer as straightforward after Shelby's insolvency. We are left to decide whether the respective policy provisions of the Shelby and Albany policies continue to dictate the outcome here, or whether Shelby's insolvency and the insertion of the UPCIGA into the picture alter the outcome. Under Utah law, when an insurance company is insolvent, the UPCIGA "is obligated on the amount of the covered claims," up to $300,000. Utah Code Ann. § 31A-28-207(1)(a)-(b); see also id. § 31A-28-203(4) (defining a "covered claim"). The UPCIGA

> (ii) has all the rights, duties, and obligations of the insolvent insurer as if the insurer had not yet become insolvent, including the right to pursue and retain salvage and subrogation recoverable on paid covered claim obligations[.]

Id. § 31A-28-207(1)(f)(ii). In addition, the statutory provision that the district

15

court held was dispositive provides:

> (a) Any person who has a claim against an insurer, whether or not the insurer is a member insurer, under any provision in an insurance policy, other than a policy of an insolvent insurer that is also a covered claim, is required to first exhaust that person's right under that person's policy.

Id. § 31A-28-213(1)(a).

The key issue here is whether, as Albany claims, § 31A-28-207(1)(f)(ii) is dispositive, and the UPCIGA steps directly into the shoes of Shelby, or, as Kendrick claims, the statutory exhaustion provision in § 31A-28-213(1)(a) now alters Albany's ability to escape coverage. Other jurisdictions facing similar situations and applying similar statutes have reached widely varying results, but there is very little precedent directly addressing the question we face today, and we have found no case on point from Utah. The cases cited by the parties deal, in large part, with the effect of a primary insurer's insolvency upon a solvent excess insurer, and do not address the scenario where the policy of the solvent insurer contains an escape clause. In the end, we conclude that the district court erred in holding Albany liable to Kendrick.

When addressing competing "other insurance" clauses, courts generally determine the effect of the clauses on the date of the accident. See, e.g., Sifers v. Gen. Marine Catering Co., 892 F.2d 386, 393 (5th Cir. 1990); cf. Pub. Serv. Co. v. Wallis & Cos., 986 P.2d 924, 935 (Colo. 1999); Allstate Ins. Co. v. Liberty Mut. Ins. Group, 868 P.2d 110, 112-15 (Utah Ct. App. 1994) (looking to the date

16

of the accident to determine the respective obligations of two insurers); City of Greensboro v. Reserve Ins. Co., 321 S.E.2d 232, 238-39 (N.C. Ct. App. 1984). In addition, several courts have held that, where a primary insurer has become insolvent and excess insurance exists under an "umbrella policy," the state insurance guaranty association is responsible for all of the primary insurer's obligations, and the excess insurer is not required to "drop down" and provide coverage. See, e.g., Wash. Ins. Guar. Ass'n v. Keeter, 847 F.2d 761, 764-65 (11th Cir. 1988); Wash. Ins. Guar. Ass'n v. Guar. Nat'l Ins. Co., 685 F. Supp. 1160, 1162 (W.D. Wash. 1988); Rapid City Reg'l Hosp., Inc. v. S.D. Ins. Guar. Ass'n, 436 N.W.2d 565, 566-67 (S.D. 1989); cf. New Process Baking Co. v. Fed. Ins. Co., 923 F.2d 62, 63-64 (7th Cir. 1991). Some courts have gone even one step further, reaching the same result in cases where the insurance policy is an otherwise primary policy with an excess clause. See, e.g., Pilling v. Va. Prop. & Cas., 95 F. App'x 126, 129-32 (6th Cir. 2004); Wyo. Ins. Guar. Ass'n v. Allstate Indem. Co., 844 P.2d 464, 467-68 (Wyo. 1992); Donegal Mut. Ins. Co. v. Long, 597 A.2d 1124, 1127-28 (Pa. 1991).

Here, Albany's policy contained a valid escape clause. See Utah Power & Light Co., 983 F.2d at 1560-61. The existence of the Shelby policy on the date of the accident triggered Albany's escape clause, and, at that point, Kendrick no longer had a "claim" against Albany that he could exhaust under Utah Code Ann. § 31A-28-213(1)(a). Albany, therefore, is not required to provide primary

17

coverage to Kendrick, notwithstanding the exhaustion provision in § 31A-28-213(1)(a). Rather, the UPCIGA, which "has all the rights, duties, and obligations of [Shelby]," § 31A-28-207(1)(f)(ii), is primarily liable and, like Shelby, could not as a primary insurer prevail against Albany's valid and enforceable escape clause.[10]

Admittedly, there is also some support for Kendrick's argument, although nothing that directly addresses the interplay between a primary insurer's insolvency and another insurer's escape clause. Some courts have required excess insurers to "drop down" and provide coverage where a primary insurer becomes insolvent and where, if the primary insurer had never existed, the excess insurer would have been required to provide primary coverage. See, e.g., Gauze v. Reed, 633 S.E.2d 326, 332-34 (W. Va. 2006); Scordill v. Smith, 635 So. 2d 407, 408-09 (La. Ct. App. 1994). In addition, several courts have emphasized that, as

---

[10] Our conclusion here finds some support in secondary sources, in addition to the cases cited previously. See, e.g., 5 David L. Leitner, Reagan W. Simpson, & John M. Bjorkman, Law and Practice of Insurance Coverage Litigation § 58:23 (2007) ("There has been broad agreement that claimants are not required to exhaust secondary or excess solvent insurance coverage before proceeding against a state guaranty fund that has stepped into the shoes of an insolvent primary insurer."); cf. Paul G. Roberts, Insurance Company Insolvencies and Insurance Guaranty Funds: A Look at the Nonduplication of Recovery Clause, 74 Iowa L. Rev. 927, 947-48 (1989) ("This approach is the most reasonable interpretation of the nonduplication of recovery clause: all parties would be placed in the same position in which they would have been absent the insolvency, while the Guaranty Fund is subjected to only those obligations for which the insolvent insurer would have been responsible had it not become insolvent.").

18

evidenced by statutory exhaustion provisions like Utah Code Ann. § 31A-28-213(1)(a), state insurance guaranty associations are only obligated as a last resort, regardless of what the respective insurers' obligations would have been in the absence of insolvency.  See, e.g., Reed, 633 S.E.2d at 334; Jackson Brook Inst., Inc. v. Me. Ins. Guar. Ass'n, 861 A.2d 652, 656-57 (Me. 2004); Me. Ins. Guar. Ass'n v. Folsom, 769 A.2d 185, 189 (Me. 2001); Scordill, 635 So. 2d at 409; Ross v. Can. Indem. Ins. Co., 142 Cal. App. 3d 396, 404 (Cal. Ct. App. 1983); cf. Oglesby v. Liberty Mut. Ins. Co., 832 P.2d 834, 843 (Okla. 1992).[11]

Nevertheless, under our decision in Utah Power & Light Co., 983 F.2d at 1560-61, Albany has a valid escape clause, and Kendrick has no claim against Albany that he is required to exhaust under Utah Code Ann. § 31A-28-213(1)(a).[12]

---

[11] Kendrick can also find some support for his argument in secondary sources.  See, e.g., Appleman on Insurance § 140.5[D] (2d ed. 2007) ("Upon declaration of insolvency of a statutory covered claim, the state's guaranty fund or association assumes the role of the insolvent insurer, as well as all related rights and obligations.  However, various limitations have been placed on these funds, including . . . the requirement that all applicable insurance policies be fully exhausted prior to guaranty fund recovery.  This latter point is true even when an excess insurer seeks to invoke its other insurance clause against the state's guaranty insurance fund.  Courts have held that to hold a state insurance fund primary over an excess carrier would defeat legislative intent."); Kent M. Forney, Insurer Insolvencies and Guaranty Associations, 43 Drake L. Rev. 813, 825 (1995) ("A claimant or insured is required to exhaust the benefits of any other insurance the claimant or insured has available for the claim against the guaranty association.  This rule is a direct outgrowth of the philosophy underlying the Act that the guaranty association is to be the 'payer of last resort,' and other solvent insurers are not entitled to reduce their liability because of the insolvency.").

[12] We need not—and do not—decide today whether, if Albany's policy had

(continued...)

19

REVERSED and REMANDED for further proceedings.



[12](...continued)
contained an excess clause, Kendrick would have had a claim against Albany that he would have been required to exhaust under Utah Code Ann. § 31A-28-213(1)(a).